Good morning, your honors, and may it please the court. Paul Clement for Trans Union. I'm going to endeavor to save five minutes for rebuttal. The jury here awarded $60 million, mostly in punitive damages, for procedural violations of the Fair Credit Reporting Act, or FCRA. As in Spokio and this Court's decision in Bassett, when there is a procedural violation of FCRA, there is often a serious question as to whether or not the plaintiff's injury is sufficiently concrete for Article III purposes. That is particularly true, as Bassett illustrates, when there is no dissemination of information to third parties. And as to over 75% of the class here, the only person who saw the class member's credit report during the class period was the class member. It was never disseminated to a potential lender or any other third party. So what was sent to those people, the majority of the class, as to whom no information was sent to the third party? What information was given to them? What was given to them was their credit report, and it came in two mailings, one that gave them sort of the body of the sort of general sort of, call it the financial credit report. The normal credit report. Yes. And then a separate letter, contemporaneously, sometimes a day later, sometimes the same day, would come and say, we also are going to tell you that you have a potential match, your name, potentially matches a name on the OFAC list. Right. And then, so that's what they got. If you had gotten that second letter, what would your reaction have been, you personally? Well, you know, I would have probably been a little bit surprised. Distressed? I don't think I would have been. Would you have taken any measures to say, wait a minute, what's going on? Would you have said, you know, I don't think I'm properly matched to somebody on this list. I'm not a terrorist. I'm not, you know, all the bad things that people are on this list. Would you have just said, oh, I don't care? I can't tell you, you know, we're way into the realm of hypotheticals. Well, we are or we're not, meaning I'm trying to figure out if the receipt of a letter that says there's a match between your name and somebody on this list of bad people, whether that has no adverse impact upon the person receiving the letter. That's really what I'm after. Yeah. And what I would say is I don't think there is an Article III injury from getting that information, and I think that's actually particularly true in the context of the statute, because this is not a statute that's protecting an interest that sort of sounds in infliction of emotional distress. I think the theory of this statute for these kind of disclosures — Roberts, but wait a minute. You're now talking about statutory protection, but I thought you were talking about Article III, which is injury in fact. Well, I'm talking about identifying an Article III injury in fact — Yes. — that is sufficiently concrete to satisfy the Constitution. Now, if a dog barks outside your window in the neighbor's yard and keeps you awake, do you have a nuisance suit? Have you been injured in fact? You might be injured in that context because you have that kind of — No, I've asked you whether you've been injured in fact. You lost sleep. I want to look a little bit into sort of the common law, but I think you might be. I'm asking a factual question. You lost sleep. Were you injured in fact? I may or may not have been injured in fact for Article III purposes. And I don't mean to hedge, but, I mean, I think that the lesson of the Court's case is, just because there's some kind of injury, that doesn't necessarily make it an injury in fact for Article III purposes. I think the lesson of Spokio and Bassett is that you have to have an injury that's concrete. I think for purposes of that, you have to — Losing sleep sounds pretty concrete to me. It may or may not be sufficiently concrete. And I think you're supposed to look at what Congress was on about and what the common law says. So let me come back to the statute, if I might. Sure. Because there's three different claims here. That's right. That we're looking at standing in. Right now we're focusing, I guess, on what I would call the disclosure aspects. And those were the letters that were sent out, the two letters, or the statutory rights in them, these letters. Right. And my question is, if in fact the fact that somebody could be on such a list would, of course, typically cause someone to try to take action, but that you can't figure out from those letters what can you do to get yourself off the list, would that be sufficient injury? I don't think it would be, but I would very much like to take issue with the premise of the question. All right. Because the second letter, among the things it told you, is it specifically gave you a contact person at TransUnion that would help you get off of TransUnion's sort of triggering list. And I think for these purposes, it's important to recognize there's the OFAC list, and then there is sort of what TransUnion and its third-party provider were doing to identify matches. And I think it's important to recognize, because if you have a first name and a surname that is a potential match to the OFAC list, I mean, that's an unpleasantness, but it's not an unpleasantness that my client created. I mean, that's just a fact. Wait a minute. It's an extreme unpleasantness that your client creates as soon as your client says, and this is on your credit report, and anybody who asks, we're going to tell them this. No, I understand that, but what I'm suggesting is I think it's worth thinking about the two separately for a second, because when you find out the information that you are a potential match, there's a sense in which that's useful information, in the same way that when you get information from the credit report and it says there's something on there that's a past undue credit bill, credit card bill, that you never ever had that credit card. I mean, you may not like hearing that news, but in the context of the statute, that's exactly what's supposed to happen. And ultimately, I think that's why I was, in responding to Judge Fletcher, I do think the court's cases instruct you to look at the common law claim or common law history and the statute and see if there's an overlap. And the reason I don't think it works to create an injury here that sounds in sort of the fright that you get from learning that you have a name that potentially matches somebody on the OFAC list is Congress is trying to get you that information. In this disclosure part of the statute, I mean, the motivating idea of Congress is information is power. If you know what's in your credit file and you know that some of it may be inaccurate or insufficiently accurate, because in this case, you did have a name match. It's just that if you drill down to sort of birthdates and things like that, you could eventually show that I'm not that person. The idea of the statute is that's supposed to happen. And I don't think you can convert that into an Article III injury. The statute says a real risk, a risk of real harm. That's what we're trying to determine whether or not that occurred here in each of the scenarios of the three classes based on the three claims or the three groups. We have Mr. Ramirez. We have the 1,000-plus that the credit report was sent to third parties. And then we have the 6,300 that their name was on the list. And then we have, you know, whether or not the procedures were violated, the disclosure and the rights, correct? I mean, I think the disclosure of information and the rights. So we have to determine whether or not, I think, it seems like a real risk, a risk of real harm under Spokio. And here, just trying to figure this out, we're talking about identifying people as terrorists on their credit reports. I know the Supreme Court has looked at this in Spokio and has given us some guidance. It seems like what they have spoken to are concerns over suits alleging incorrect zip codes, if I recall correctly. And I'm not sure that this is the technical or procedural violations that are contemplated in the Supreme Court discussion of zip codes. So why don't you, I want you to have the opportunity to respond and to speak to that, if you could. Sure. Your Honor, I don't think the gravamen of this is, I'm not here to tell you that this is sort of, that this information is the same as a zip code. I mean, I do want to emphasize, though, that what's being told both to the party and to the potential creditor is that there's a potential match. I do think the difference between potential match and match is important. And I want to get to typicality before I sit down. But you're being told you're a potential match, which at some level is true. I mean, again, if you go right now today to the OFAC website and type in Sergio Ramirez, it will bring a hit that there is a potential match. And so, you know, with respect to the disclosure claims, you're trying to get that figured out. And with respect to the material risk that I think you're looking for in the statute, I think what it's a material risk about is that incorrect information will be disseminated to a third party. Right. And so the reason I think this is, in some respects, an easier case than Spokio is Spokio, when it's talking about the zip code example, is talking about a situation where there would not be actual injury, even though the information is disseminated to a third party. Here, the letters only said, you know, here's a number to call. They didn't say how to dispute this. And I know you're making the best case for your client, but I'm just trying to figure out how the risk of harm is the same here to what, you know, the Supreme Court told us in Spokio. It seems more elevated here. It seems more significant here. Even a potential terrorist, I think, has an effect. Being said you're a potential terrorist has an effect that's more significant. Well, again, what you're being told is not that you're a potential terrorist. What you're being told is that your name, your first name and your last name, is a potential match to a name that is, in fact, on the OFAC list. And that information is actually accurate. It is, but if that information is disseminated to a third party, say, I don't know, automobile sales company, Nissan, that you're a potential match, I think it's a fairly likely response of the company in trying to decide whether to do business with you that that potential match may scare them off because the penalties for doing business with somebody who's actually on the list are so high. I think that does create that risk. Am I wrong about that? Well, two things, Your Honor. One is I do think that there is a better case for there being a material risk with respect to the roughly 1,600 people that actually had the report disseminated. Well, no, I'm asking you something. If it is disseminated, so those are the people I'm talking about, is there a risk that the person received, the business receiving the information that says, listen, there's a potential match, this guy may be on the bad guy list, that their response will be, you know what, I don't want to make the loan to you, I don't want to do business with you because the penalty for me for doing business with somebody who is on the list is so high. Judge Fletcher, that might be my intuition, too, in the abstract. The record here actually does not bear that out. Well, I brought it out with respect to Mr. Ramirez. It did with Mr. Ramirez. It did.  The information that everybody needed standing in Pearl, Lujan, at the end of the road where we got the damages awarded, claim one, which is the information is just sitting in the box, so to speak, at whichever credit agency is involved, but one quarter of those people actually had it disseminated, okay? So would you agree that for those for whom it was actually disseminated would have standing because there is a reasonable risk of harm there that once somebody finds out you're a potential terrorist, it could impact your financial transactions? And they only disclose it when people are in a financial transaction asking for the information. I would agree that there's a much stronger case for standing there. I wouldn't concede that they're standing there. And part of it is, and I don't know that the case law directly tells you what to do with this, but I can't ignore the fact that with respect to everybody but Mr. Ramirez, there's no evidence that they were actually denied credit, inconvenienced, or the like. And I do think, you know, I think... Well, that's true, but then you get to the other test, which is was there, if they're to trial because of a potential risk, is the potential risk itself that once in the hands of a creditor, you might, it's likely that there's going to be a negative impact, is that sufficient or is it your view that they needed to put on some kind of class-related evidence as to the likely impact? I think they would have needed to put on some class-related evidence or they would have had to show that there was in the main some material impact on sort of information that hurt the reputation or certainly, I mean, I don't want to say that you have to show that credit was denied because I don't think that's what the law is. But I do think that when you have a situation where by all accounts, I mean, only one person actually had credit denied, and I believe that in the vast majority of these situations, you know, maybe because the potential match that kicked on had a radically different birth date and the lender, whoever it was, did what they're supposed to do contractually and actually looked at this, that people got their credit same day. It wasn't an inconvenience in the least. Well, if I were to disagree with you in part and say that only the quarter had the standing and that they retained it at the end because of this material risk, then would there need to be a reversal of the verdict overall because that is just one claim of three claims and the whole claim doesn't survive? I think you would have to decertify the class at that point. And I think, you know, and look, we, just to be clear about sort of the waterfront, if you will, I mean, I'm not here to say that Mr. Ramirez doesn't have standing. He suffered Article III injury. You know, if anything, I'm here to tell you that he suffered significant injuries in the context of this particular statutory violation that make him a very atypical class representative, which I think is a separate and independent problem. So I don't have any issue with his claim. I understand. With respect to the 1600, I'm not going to concede that there's standing, but I will tell you I understand why you would treat them differently and may think they have a better claim. I think by the end of the trial, given the evidence that came on, the motion to decertify should have been granted. I think even they don't have standing. But I think with respect to the vast majority of the people who are in this class, more than 75 percent, I do not think that they suffered Article III standing at all. So I think they have to be, the class has to be decertified. And I think that independent of the Article III problem, I mean, there's a massive Rule 23 problem here, because I don't think somebody who is denied credit in the dealership testifies credibly that he was embarrassed in front of his family, that he canceled his vacation. That person is not typical of a class, the overwhelming majority of which are people who only got these letters in the privacy of their own homes. Do you want to remain, save your remaining time, but we have a question first. Can I ask a question? Sure. So is it your position then that a class can never be certified if there's a possibility that someone within the class lacks standing? I'm just trying to figure out if that's what you're arguing here. No, I don't think I'm arguing that, and I think that would be inconsistent with this Court's decision in Torres, which at least at the pleading stage, I don't think you need to make that showing. But I do think at the end of the day, when an Article III court is cutting damages checks to individual litigants in order to satisfy Rule 23, the Due Process Clause, and the Rules Enabling Act, you can only have damages awards in a class action that go to somebody with Article III injury, just as would be the case with an intervener, just as would be the case with an individual plaintiff. So would any issues with standing then be resolved by the district court when it would award the award of damages? Could any issues of standing be resolved at that point? I mean, they could be, and we tried to get the class decertified at that point. The reason it doesn't sort of happen the way that maybe – I don't want to – I don't know exactly what's motivating your question, but obviously in a case with actual damages, you know, that's not a problem, because if you're awarding actual damages, you have Article III injury. It's the statutory damages here that creates the problem, because – and just maybe I'll finish with this, but, you know, as to these individual class members who are – these absent class members who only got this notification in their own home, they're going to get roughly $8,000 in about, you know, about $900 in compensatory damages and then something like, you know, $5,000 or $6,000 in punitive damages. That award makes perfect sense in the context of Mr. Ramirez. It makes no sense with respect to those absent class members who don't have any Article III injury. And the last thing I'll say about that is, in addition to the other problems with this verdict, I mean, I do think there's a serious State farm problem here, because if you're supposed to do a ratio of punitive damages to actual damages, you can't count the statutory damages, which aren't actual damages, and there's virtually no proof of actual damages in this case, so the State farm ratio approaches infinity. Thank you, Your Honor. We'll give you some time for rebuttal, but I just want to go back to the procedural issue, because it makes sense about improperly certified classes with respect to the outset, with respect to summary judgment, with respect to going to trial, but the case went to trial. So my question then, is it really a question of standing and decertifying the class, or is it a question of lack of substantial evidence to support, or is that a distinction without a difference? I tend to think that it's the former and not the latter. And, you know, this is kind of a theoretical question about what you think, you know, about a class action. But I sort of think, I look at this case, and I don't think that there's a substantial evidence problem if Mr. Ramirez really is a typical representative of his class, because the proof of him is supposed to take care of it for the class. I think what the case shows, the way the case was presented, is that kind of what my clients were saying all along turned out to be true, that there's an Article III problem here because these are procedural FICRA violations and there's a typicality problem. And then when you look at the way the case was actually tried, I mean, you know, Mr. Ramirez didn't focus, and I don't blame him for this. I mean, he's got a right to litigate his case. But he didn't litigate this case as somebody who only received two letters in the privacy of his home. He told the jury about his very unpleasant experience at the dealership, and he used that as a reason why, specifically as a lawyer did, why they should get statutory damages at the top of the range and punitive damages on top of that, all of which makes perfect sense in his case, but all of that just exacerbates the typicality problem that we were talking about from the very beginning of this case. All right. Thank you. Thank you. Please. Good morning, Your Honors, and may it please the Court, Jim Francis for the appellee, Sergio Ramirez, and the class. The district court's ruling granting class certification in this case was not an abuse of discretion, and its ruling on TransUnion's post-trial motion contained no errors, and its decisions should be affirmed in their entirety. Starting with Article III standing, contrary to what TransUnion argues, and what is not required in this circuit post Bates and its progeny, which provides that only the named plaintiff needs standing, but the plaintiff needs standing. Sotomayor, the Bates case was an injunction case, correct? It was an injunction case. So it seemed to me, I mean, with all respect to our colleagues, that that's a little bit of loose language about what Bates actually said and then importing it to that footnote. Yes, Your Honor. I would just point out, I don't think we need to or the Court needs to look at that issue with Bates, because as I'm about to outline, I think there was standing for all class members that was demonstrated, but I just want to point out that it wasn't just In re Zappos. The Ollier case mentions it as well, and it doesn't limit the Bates doctrine to injunctive relief. But putting that issue aside, I think what the Court's really questioning, was questioning Mr. Clement about, was this class-wide Article III standing. And there was Article III standing proven for each class member in this class. First, with regard to the accuracy class, each class member had a consumer report prepared about them that was communicated to them, as Judge Fletcher was asking Mr. Clement about, that associated them as a terrorist or a government criminal as a result of trans-union's name-match-only procedure. Every one of those class members has standing because that concrete interest, as this Court in Spokio III, and actually as the Supreme Court said in Spokio II, the FCRA under Section 1681EB created a concrete interest to be free from credit reports which contain inaccurate, derogatory or defamatory information. Every single class member was subject to that increased risk of harm that they would be defamed. And as the Supreme Court mentioned in the ---- It seems to me there is a distinction to be made in what kind of threatened or impending injury that there was. I don't think ---- Did you have any testimony, for example, on the frequency with which these are disseminated and, you know, sort of what I would call more class-wide information about that? Yes, Your Honor, we did. And, in fact, that's, again, for ---- I don't think for Article III purposes, I think every class member is in, but in terms of ---- let me answer Your Honor's question. There was evidence that was agreed to, it was a stipulation, that about 25 percent of the class, just in a six-month period of time, had the information disseminated to a third-party creditor. Over the two-year statute of limitations time period, that would be about 100 percent of the class would have had all their credit reports published to a third party. The jury received that information and that evidence, and it was ---- the jury was free to make inferences from that evidence that they all were likely facing a publication of this information to a third party. That was the jury's province, and it had that evidence to do so. And so ---- Let me ask you this. Why is risk-standing alone sufficient to create Article III standing for purposes of recovering damages? I'll give you an example that's totally outside the credit reporting. Someone drives past you at 100 miles an hour, subjecting you to enormous risk, but you're not hurt. Do you get damages because of the risk to which you were subjected? Well, under the Fair Credit Reporting Act, if you prove a willful violation I'm not asking about that. I'm asking about if I suffered damages in the Article III sense because somebody drove past me at 100 miles an hour, I was subjected to risk. You have Article III standing to be in Federal court, whether or not the statute that would For what? What was the What would be the What's the risk? Yes, Your Honor. The increased risk of that harm, and that's what the Supreme Court in Spokio 2 and this Court in Spokio 3 discussed. It's a risk of material harm. Every class member had that increased risk of material harm here by having the information in that was prepared about them. And let me just go back to Let me pursue this for a minute. I'm having trouble seeing how a risk that did not eventuate in any actual harm. He drives past me. I might not even have known that he went past me at 100 miles an hour. I was subjected to risk, but it resulted in no harm to me. I don't see how I have been harmed, particularly if I didn't even know about it. Well, Your Honor, I think to answer your own question earlier to Mr. Clement, they all did know because they received the letter. You see, that's a different question. I'm asking whether risk standing alone is enough to give Article III's damages for purposes, Article III standing for purposes of damages. For the accuracy claim, it is, because as TransUnion admitted in its reply brief, creditors are routinely looking at people's credit reports. In fact, I would – I'm sure that the panels – I'm sure you've looked at your credit report. If you look at the bottom under inquiries, your credit report's being accessed all the time. So the evidence here was that was a very real and imminent risk, just like in Clapper. That's what the Supreme Court was concerned about. Is this the risk that's real or is it something that's attenuated? This was a very real risk that every single person, and again, 25 percent over 6 months, extrapolated to 2 years, that's 100 percent of the class had the information published. But let me just back up. I don't want to be too statistical with you, but that assumes no repeats. It's going to give you a pretty high percentage, but it's not going to give you 100. I think you're right, Your Honor, and I would agree with that. The one thing that I would also advise the Court is that the FCRA makes it very clear that in order to recover for the accuracy claim, you don't need publication to a third party. The statutory language under Section 1681eb only concerns the preparation of a consumer report, and a consumer report is any information that is communicated. There's no reference at all to communication to a third party. This Court has had occasion to look at this very issue in Guymond and Otiano and has found that in this case, there is no need to prove publication to a third party. So you don't need that to recover damages under the Fair Credit Reporting Act. But again, for the Article III issue, that's just a threshold question in terms of whether or not there was a risk of harm or a harm to a concrete interest. As I said before, Congress elevated the common law defamation into the Section 1681eb and made the preparation of the report a violation because that risk is so great. And here, Your Honors, what I would point out, as Judge Merguia, you were asking about earlier, what makes this case different in terms of standing from all of the other cases that TransUnion has cited, and Bassett's not even an accuracy case, is the nature of the information. We're not talking about a zip code. We're not talking about even a 30-day late on a credit card. We're talking about the worst and most defamatory type of thing that a credit reporting agency can say about somebody. You are a terrorist. Let me ask you, assume just for the moment that only 1,800 of the class members had Article III standing for purposes of the reasonable procedures claim and none of the other class members had standing on the disclosure claims, is it your position that each class member nonetheless can recover a 7,000-money judgment in their name just because Mr. Ramirez had standing? Would that conflict with the Rules Enabling Act prohibition on enlarging substantive rights because it would give someone who could never have brought a claim on their own the right to recover? Can you address that for me? Yes, Your Honor. As I think it's probably clear from my presentation that we disagree with the underlying premise that only the 1,600 are in this class. So, yes, if you were to accept the premise that only 1,600 people here had a claim or had standing, then, yes, obviously, if they couldn't assert the claims in court, then, yes, I think I would agree with Your Honor's question. Again, we have three claims here, any one of which would have satisfied the damages award based upon TransUnion's agreement. So if any of the claims at issue here survive and they're standing for any of the claims based upon what the parties stipulated to in this case, it would substantiate the statutory damages verdict and the punitive damages verdict. Do we have evidence in the record as to how much money TransUnion made from this part of their business? I understand we've got evidence as to what their overall assets are, but do we have evidence that tells us how much money they made from doing this during the class period or during a more extended period? There is evidence in the record, I think, that they introduced regarding just the OFAC product and what they earned. I don't have that information. I tried, I mean, I went into the ER to try to figure out what they were charging per inquiry, and I couldn't quite tell. It looked like it might have been 50 cents per, but I couldn't quite tell. And I looked at the number of inquiries during the class period. It was a little over 2 million, but I couldn't quite figure out how much. I wasn't sure that I was understanding the record properly. I think Your Honor is correct. I think the amount per transaction was probably somewhere in that realm. I'm actually forgetting right now exactly what that was. So what is the – well, I have a question on typicality, and then I have a question on injury with the class. What's the injury on the disclosure claims? Very good, Your Honor. The injury to the disclosure claim is that by denying the – all of the class members the information that OFAC was in their file and denying them the instructions on how to inspect that and dispute it, what they did was they harmed each class member's concrete interest in being able to discover inaccuracies in their file and dispute and correct those. So they directly – that's not even an increased risk of harm. That's a direct material issue. But where was – what's the evidence of that harm other than as to Mr. Ramirez? The evidence of the harm is it's an informational injury. I understand. But we've been having a lot of informational injuries floating around lately because of various statutes. So that doesn't tell me really what we have. Do you have any analogy to traditional common law interest that you might give us? It seems like – I'm trying to figure out what the concrete interest that the FCRA summary of rights provision was designed to protect. Yes, Your Honor. I would analogize it to the public citizen case that the Supreme Court noted as creating Article III injury in Spokio II. That's what the Supreme Court was saying, that when information was denied to those consumers, that in and of itself was injury to create standing. And here – So what happened here to anyone other than Mr. Ramirez? What happened here is none of them were told that OFAC was part of their file. And instead, they get some other letter which references OFAC, but specifically doesn't tell them they can dispute it, doesn't give them any instructions, doesn't provide them with the statement of rights, in clear violation of Section 1681GC, which said – So in other words, because there were two notices and one statement of rights, that's a violation in and of itself? Well, there are two – Answer that question first. There are two violations here. I understand. So – and I'm sorry, the question, Your Honor? Well, there's two notices or two pieces of paper you get, correct? There were two pieces of paper in this case, yes. Okay. And there was one notice of rights? There was one notice of rights, correct. And is that a violation in and of itself? It wasn't a violation of rights for the first piece of paper if it disclosed the OFAC information and told them how to dispute it. But it didn't. It wasn't part of that. In fact, what the second piece of paper did was say, you've already gotten your file that's over there. Here is something else, and there's no right to dispute. There's no way to dispute it. You don't know that. So it's not a de minimis claim here. We're talking about the ability, a concrete – or, excuse me, Congress elevated the interest of discovering inaccuracies in your credit report to a concrete interest. And as this Court outlined in Spokio 2, the question is, was there a harm to that interest? And the answer is yes. This company, in prior litigation, was told by the Third Circuit, you must include OFAC information in the file, and you must let people dispute it and correct this information. They had that. This same very company had the Third Circuit find in 2010 that the name-match-only procedure here was reprehensible. That is unusual, to have a corporate defendant in a class-action trial years later when a circuit court has already considered and told it that its practices are reprehensible. I would like to just turn to Typicality, if I may, unless the Court has further questions. TransUnion's Typicality challenge, I think, is even less strong than its Article III challenge, and it's without support. First, the standard for Typicality under Rule 23a3 is whether or not the claims or defenses of the class representative are typical of the claims and defenses of the class. Not the specific facts surrounding the class representative as this Court held in Hannon. It's simply, were his claims typical of their claims? And the answer is unquestionably yes. Judge Corley did not abuse her discretion and find Mr. Ramirez typical. He received the same papers or he received the same notifications from TransUnion as every single class member. He was associated as a terrorist or government OFAC criminal just like every other class member. He received the same information. His information was disclosed, correct? His information was definitely disclosed, yes, to the car dealership at issue in the case. That's not an insignificant difference, a disclosure to someone, is it, in terms of Typicality? I think for it — I think it doesn't impact Typicality. I think what Your Honor might be asking, I think really what they're arguing is evidentiary. Okay. I think what they're really saying is, in fact, they kind of admitted in their punitive damages part of their brief, is that Mr. Ramirez's factual scenario was so attractive and sympathetic it drove up the jury award. But you know what that is? They might be right, too. But you know what, Your Honors? That's not a Typicality Rule 23a3 challenge. That's an evidentiary ruling challenge that they should have made and they waived. So what you do, you file a motion in limine when you're going to face a class action, and you say, Mr. Ramirez can get up and say these three things. I got letter A, I got letter B, I got letter C. Thank you. Sit down. Okay? That's a motion in limine. And they have not raised that and they've waived that argument. The way I look at this Typicality, or at least I'm tempted to look at the Typicality question, is the following. I look at the class members with the claims that are the weakest. That's the majority of the class members. Those who had the information revealed to them in these two separate pieces of paper, but as far as the record shows, we don't know that they got, that this was revealed to a third party. I understand your extrapolation, but we don't have any firm evidence that that happened. They're the, they've got the weakest claim. Now, does Mr. Ramirez share all of the characteristics of those people with the weakest claim? And I think the answer is yes. Does that, but because he has a lot more, does that defeat Typicality? It does not, Your Honor. As this Court, again, outlined in Hannon, the specific facts, and I think I'm getting the language correct, but the specific facts surrounding the claims are not relevant to Typicality. So. Let me, let's ask you the same, I think, question that was posed to Mr. Clement. If we hold or find that the 1,800 plus class members who had a report requested on them had standing to bring the reasonable procedures claim, but the remaining class members perhaps lack standing, what does that mean for the verdict here? Do we have to remand for a new trial? I don't think so, Your Honor, because as I said before, if the jury returned a verdict on any of the claims, then every class member recovers to the same degree. That's the way the verdict form was created, and TransUnion agreed to that. So as long as there's one claim that remains standing, or that remains after the panel's decision, that would support the jury verdict in this case for all class members. So if I just may move on and just touch briefly upon willfulness, unless the Court wants to hear about willfulness. I think the evidence of willfulness here is so abundant and pervasive. As I said before, this is a defendant for whom the Third Circuit already found. Could you address the punitive damages? There's an argument here that this is excessive in violation of Gore and a whole bunch of cases. Could you respond? Yes, Your Honor. We do not believe that the punitive damages verdict here is excessive for the reason that this case presents unique reprehensibility. That is at the highest end of reprehensibility for a Fair Credit Reporting Act case. Again, as I said before, they were on notice that this name-match only procedure was creating harm for consumers for years. They faced a jury trial and a verdict and a 91-page decision from the Court of Appeals for the Third Circuit which said it was reprehensible. In addition, there was evidence in this case that they had other alternative methods where they could have gotten it right and not mix these people up, because there was technology through their vendor that could have screened based upon date of birth. In addition, there was warning from the Department of Treasury, 2007, 2008, 2010, warning it that they're concerned about TransUnion's false positive rate. Okay, I get all of that, but there's an argument that says you say it's a 6.5 to 1 ratio when you compare the statutory damages to the punitive damages, and I get that, but the argument is, well, but the true ratio, if we're looking at Gore and then succeeding cases coming out of the Supreme Court, is to actual damages, and therefore, the ratio that we've got here really is not calculated on the correct basis. How do you respond to that? Understood, Your Honor. The way I respond to that is under the Fair Credit Reporting Act, statutory damages are a surrogate for actuals. They are compensatory. Well, I understand that, but in fact, they're not particularly compensatory. That's why we call them statutory. But, Your Honor, if you look at the language of Section 1681n, it provides that for a violation, you can recover either actuals or statutories, and the cases that have looked at it in Seventh Circuit and Murray v. Singular Wireless, all the circuits that have looked at it have found that statutory damages are designed to allow actual – a surrogate for actual damages when damages are hard to prove, when you don't – you can't have the proof for it, or when they're so small or they're difficult to quantify. But there's no question that the statutory damages here was an actual damages – was in place of actual damages for these people. It was compensatory. So you look at the compensatories in reference to the punitive damage ratio here, which, again, is a 6-to-1. And as I said, what's – 6.5. 6.5. 6.5-to-1. And in this case, we think that falls well within the case law, that if Mr. Ramirez's case were tried by itself and the jury came back with $984 and $6,300 in punitive damages, nobody would be challenging ratio. I realize we're taking you over, but what about the additional argument that when we're talking about class-action damages, there's some notion that they shouldn't be so high in the sense of multiplying as to each of the members of the class, because then you get an enormous punitive damages reward – award, which does more than merely punish and deter. Yes, Your Honor. So the response to that is there is no appellate case law or guidance which provides that in a class action, the ratio analysis should be different under State form. And we would argue, as we did, and as Judge Corley also pointed out, that that would undermine Rule 23. If the analysis for damage, if you can only recover less when you're in a class, then it would undermine the purposes of Rule 23. So we do not think that there is a basis to reduce the ratio because this is a class action. Thank you. Thank you, Your Honor. Well, we've given him a little more time. We took up your time, so would you please put three minutes back on the clock? Thank you, Your Honor. Just a few points of rebuttal. First of all, in response to your specific question, Judge Fletcher, there is evidence in the record about how the punitive damages award here compares to the revenues from the OFAC project in particular. It's at ER 132, and it shows that the punitive damages award here is 30 times the revenue for the entire year, and since the class period is 6 months and the revenue is a year, that's basically 60 times the revenue for the product. But if punitive damages are designed to punish and deter, if we're talking about deterrence of continuing conduct, I think we'd get to look beyond the class period. I'm not sure that you do, but in all events, I think these numbers are so enormous, I'm not sure much turns on that. I get the numbers. I understand that argument, yes. The second point I would say is just, and this is responsive both to Willful, but also for the lack of injury for the people that received this letter. When they got the second letter about OFAC, I mean, you know, it is not the platonic form of what we'd like to do. The reason the class period ends where it does is because we eventually got this in to a single mailing. But there's an assumption here in a couple of the questions and certainly in my friend's argument that there was no information here that allowed you to correct the problem. And that's actually just not true and it's not borne out in the record. So the letter that Mr. Ramirez got is at ER 467. The last thing it does is provide a phone number if you have additional questions or concerns for somebody at TransUnion. That person at TransUnion was actually somebody who had heard about OFAC and was actually specialized in sort of fixing these problems. And this was their effort to be directly responsive to the Cortez decision where what was happening is somebody would call sort of the general number at TransUnion and they'd get somebody who really never heard of OFAC. They'd look at the credit file. They wouldn't see anything about this and they'd say everything's fine. So this at least got you to a person who knew what the problem was and could help you fix it, which is why the record in this case shows that both the contact rate was higher actually during the class period with the separate letter than it was afterwards where they got all the information into two letters. And the reason But the letter just had the number. It didn't say this is how you dispute this. That's why I start with the idea this is not the platonic form of the letter, but it does provide you information if you have further questions, which I assume if you had a dispute you would. And again, the two mailings is not the platonic form of this. But the reason that they had two letters instead of one is because that was the way that they could most quickly try to take action in response to the Cortez decision. One thing about the 75% number and the six-month class period, my friend keeps like wants to expand it to two years, but this is only six months and it's six months for a reason. It starts with the Cortez decision so they have a better willfulness argument and then it ends with the merging of the letter and some other improvements in the technology. So they're stuck with the six months and what the record reflects is that 75% of the party during the class period, so they are not injured. If I can give you... Let me go back, though, to see what this makes as a practical difference, because as he stated the stipulation, if any of the claims survives, then the damages, leaving aside the punitive damage, but the damages amount remains. Is that correct? That's not our position. Our position is that if even one of the claims falls, then the whole award falls. And how does that compare with what he claims is the trial stipulation? He bases this on the verdict form and what he ignores and what we point out in our reply brief, so you can look at this and see what you're persuaded by, but we tried as part of that verdict form to have an additional question that said, I don't have enough information for the entire class. And we were not allowed to put that on. And it seems to me that because we tried to do that, that preserves our ability to say, look, you now have sort of what amounts to kind of a generalized verdict, and if one of these claims falls, you've got to have a new trial. So that's our view of that. If I can beg your indulgence for 15 seconds to just say the following, which is, the district court here at the beginning of this case, when they confronted the California state claims, recognized that if you had to prove actual injury, which you do under the state statute, you couldn't have a class action here. That same logic really applies to this class action. You cannot have, you do have to prove actual injury to comply with Article III. You can't have a class action, and that is a fortiori true for the 75% who never had their information disseminated. Thank you. Thank you. I would like to thank both of you for the very helpful arguments and also the extensive briefing here. The case just argued, Ramirez v. TransUnion, is submitted and we're adjourned for the morning. All rise. This court is in session to hear the jury.
judges: McKeown, W. Fletcher, Murguia